1997-NMSC-048

945 P.2d 1013

**In the Matter of Duane S. HAMAR, Esquire, An Attorney Admitted to Practice Before the Courts of the State of New Mexico.**

**No. 24199.**

Supreme Court of New Mexico.

Sept. 26, 1997.

Virginia L. Ferrara, Chief Disciplinary Counsel, Albuquerque, for Disciplinary Board.

Duane S. Hamar, Portales, Pro Se.

## OPINION

PER CURIAM.

(1) This matter came before the Court following disciplinary proceedings conducted pursuant to the Rules Governing Discipline, 17–101 to –316 NMRA 1997 and upon a recommendation by the disciplinary board that we approve the conditional agreement not to contest and consent to discipline executed by Duane S. Hamar, wherein he agreed to accept the sanction of disbarment and to make restitution to those injured by his misconduct. Under the uncontested facts of this case, we agree that disbarment is the appropriate sanction and approve the agreement.

(2) Margaret Spriggs retained respondent to represent her in a personal injury case for injuries she received on December 4, 1994. Spriggs was receiving treatment from a certain physician and, in February 1995, respondent signed a letter of protection on behalf of Spriggs agreeing to pay her physician for medical costs incurred from the proceeds of any settlement or judgment received. The physician's services totalled $8357.24.

(3) Spriggs and a certain insurance company settled the case and on September 8, 1995, she received a settlement check in the amount of $25,000, which was deposited into respondent's trust account.

(4) The physician was not notified of the receipt of these funds until he made inquiry in January 1996 and was then told that the case had settled in December 1995. Despite requests from the physician's office and his attorney, the physician's costs remained unpaid. On July 11, 1996, the physician filed a complaint with the office of disciplinary counsel.

· (5) In responding to the complaint, respondent stated in a letter dated August 2, 1996, that he had been attempting to have the bill discounted but, since he "did not get the discount authorization in writing," would make payment within the next few days. He paid the doctor $8357.24 for Spriggs' medical expenses on August 16, 1996, and notified disciplinary counsel that he had done so.

(6) To ascertain whether the funds owed to the physician had been on deposit in trust at all times since the settlement, disciplinary counsel wrote to respondent and requested copies of bank records pertaining to his trust account. The records provided by respondent indicated that the balance in the trust account had fallen far below $8357.24 on several occasions between September 1995 and August 1996, at one point even showing a negative balance of −$5.77.

(7) When asked to explain, respondent replied that he understood that payment of a client's medical bills was his own personal responsibility. Consequently, he had distributed all settlement funds to the client and to his office, leaving nothing in trust. Respondent's purported understanding that he had some obligation to accept personal responsibility for a client's medical bills is unknown to us. This is a novel concept and certainly not one espoused by this Court. It is possible, however, that respondent may have misinterpreted an earlier opinion of this Court, wherein we held that once an attorney had accepted from a client an assignment of settlement proceeds to a creditor, the client (as assignor) may not unilaterally cancel or modify the agreement. *See Romero v. Earl*, 111 N.M. 789, 810 P.2d 808 (1991). We further held in *Romero* that if the lawyer were to accede to a client's demands not to pay the assignee (in that case a health care provider) and instead give the disputed funds to the client, the lawyer could be held liable to the assignee. The opinion does not, however, hold that attorneys are generally obligated to pay a client's medical bills.

(8) Respondent's own trust account ledger pertaining to the Spriggs case indicated that only $20,427.59 of the $25,000 had been distributed, which should have left a balance of $4752.41 remaining in trust. This figure did not, however, comport with bank records pertaining to the account. Respondent's ledger indicated that Spriggs received only $6624 of the $25,000 settlement. Under the one-third contingency fee agreement, Spriggs should have received $8309.43 ($16,666.67 minus the $8357.24 owed to the physician).

(9) The Spriggs ledger further indicated that on September 7, 1995, a check was issued from her funds to a person named "Smith" in the amount of $5800. The payee on the check was "Dr. Smith and Eric Dixon." "Dr. Smith" is Dr. William J. Smith, a chiropractor in Portales, New Mexico. Dr. Smith never treated Spriggs but, on June 27, 1996, wrote a letter to respondent acknowledging receipt of a payment of $5800 on September 7, 1995, to be applied to the accounts of Alfonse Gonzales, Pamela Bollinger, and Christopher Bollinger and requesting payment of a bill incurred by another patient named Kelly. This was an obvious misuse of Spriggs' money, as an attorney may not invade the funds of one client to pay the obligations of another.

(10) The Spriggs ledger indicated another payment of $1003.59 to the First National Bank on October 6, 1995, however, respondent has no documentation to show that this payment was made on behalf of Spriggs. The ledger further indicated that on August 20, 1996, respondent transferred $11,000 into his trust account, monies which represented a fee to himself from another client, to cover the check he wrote to Spriggs' physician.

■ (11) Commingling of funds is obviously unprofessional and unethical, and by reason of the foregoing, respondent violated the following Rules of Professional Conduct: Rule 16–105(A) by charging an excessive fee; Rule 16–115(A) by failing to hold the proper-

ty of clients and third persons separate from his own property and maintain complete records of his trust account; Rule 16–115(B) by failing to promptly notify a third person (Spriggs' physician) of his receipt of funds in which the third person had an interest and promptly delivering to that person funds to which he was entitled; Rule 16–804(C) by engaging in conduct involving deceit, dishonesty, misrepresentation, or conduct involving deceit, dishonesty, misrepresentation, or fraud; and Rule 16–804(H) by engaging in conduct adversely reflecting upon his fitness to practice law.

(12) Janet Kelly retained respondent to represent herself and her daughter in a personal injury case for injuries her daughter sustained in an accident. The daughter was receiving treatment from a certain chiropractor and, on June 28, 1995, respondent signed a letter of protection on behalf of the child agreeing to pay the chiropractor's costs out of any settlement or judgment received in the case. The chiropractor's services totalled $5813.53 as of November 9, 1995.

(13) The Kellys settled their case with a certain insurance company and, on October 27, 1995, a check was issued to Kelly, her daughter, and respondent in the amount of $20,000. On November 13, 1995, the check was deposited into respondent's trust account.

(14) The chiropractor was not notified by respondent of the receipt of these funds as required by Rule 16–115(B) but in June 1996 learned through other sources that the funds had been received the previous October. Despite requests by the chiropractor to both Kelly and respondent that the bill be paid, it was not. On July 25, 1996, the chiropractor filed a complaint with the office of disciplinary counsel. The chiropractor enclosed with his complaint a copy of his June 27, 1996, letter to respondent acknowledging receipt of $5800 for patients Gonzales and Bollinger, apparently paid out of Spriggs' settlement, and requesting payment for the Kelly costs which, with interest, now totalled $6548.87.

(15) In responding to the chiropractor's complaint, respondent explained that "payment for several cases were (sic) made simultaneously to [the chiropractor]" and added that he believed the payment for the Kelly child was included in that payment. He further stated that he would review his files and, if there was more money due to the chiropractor, he would see that the matter was resolved. Respondent ultimately paid the chiropractor $6548.87 for the Kelly child's medical expenses on August 16, 1996, and notified disciplinary counsel that he had done so.

(16) Bank records pertaining to respondent's trust account indicated that the balance in the account had fallen far below $6548.87 on several occasions between November 1995 and August 1996. When asked to explain this, respondent reiterated his understanding that the payment of a client's medical bills was his personal responsibility and that he distributed all settlement funds to the client and to his office, leaving nothing in trust.

(17) Respondent's trust account ledger pertaining to the Kelly case, however, indicated that only $19,506 of the $20,000 was ever distributed, which should have left a balance of $494 remaining in trust. This figure does not comport with bank records pertaining to the account. The ledger also indicated that the Kellys received only $7500 of the $20,000 settlement; however, under the one-third contingency fee agreement, the Kellys should have received $7519.80 ($13,333.33 minus the $5813.53 originally owed to the chiropractor. Any other monies paid to healthcare providers would, of course, also have been deducted from the amount the Kellys received.).

(18) An outstanding bill to a medical clinic in Odessa, Texas, in the amount of $2922.64 was never paid by respondent, despite requests from Kelly that he do so. Respondent had this bill prior to the time the case was settled. Furthermore, Kelly does not know if other medical bills were paid, as respondent never gave her a closing statement indicating how the $20,000 was distributed. Although not enumerated in the charges, an attorney's failure to provide a client with a written statement regarding the distribution of funds in a contingency fee

case violates Rule 16–105(C) of the Rules of Professional Conduct.

(19) Respondent's ledger for the Kellys indicated as well a payment of $10,000 to respondent's law firm on December 1, 1996, and a payment of $2006 to the First National Bank on November 13, 1996. Respondent was unable to provide documentation to show that the latter payment was made on behalf of the Kellys, and Kelly knew of no debt of hers to the bank in that amount and was unaware that such a payment had been made from her trust funds. The ledger sheet further indicated that respondent paid $6548.87 to the chiropractor on August 16, 1996, at a time when he arguably should have had only $494 remaining in the Kelly account. Several weeks later, between September 3 and September 5, 1996, respondent deposited $6054.87 in fees into his trust account to cover the check to the chiropractor.

(20) With respect to the Kelly settlement, respondent once again violated Rules 16–105(A), 16–115(A), 16–115(B), 16–804(C) and 16–804(H) of the Rules of Professional Conduct.

(21) Ids Schaap died on January 5, 1996. His adult children retained respondent to probate his estate. At respondent's suggestion, monies from an account in the name of Ids Schaap were transferred to respondent's trust account for the purpose of paying estate expenses, such as the costs associated with Schaap's final illness and funeral. On April 3, 1996, the amount of $46,444.63 was deposited into respondent's trust account for the Schaap Estate, which brought the balance in the account to $46,438.88, as the prior balance had been − $5.77. In addition to the April 3 deposit, monthly rental checks in the amount of $500 from Joe and Maria Sanchez and payable to the "Ids Schaap Estate" were sent to respondent.

(22) After some time had elapsed, the Schaap children became concerned that the estate bills were not being paid. In November 1996, Schaap's daughter inquired of respondent concerning how much money had gone into his account and from what source(s), what expenses had been incurred, and which bills had been paid. She also requested copies of all checks received from Sanchez. When no response was received, the children discharged respondent as the estate's attorney and requested that he turn the file over to another attorney of their choice. They also requested an accounting of all monies in trust for the estate and a refund of any amounts remaining. When respondent released the file to the other attorney, it was then discovered that the bills given to him by the daughter were still in the file and had not been paid. When her repeated requests for an accounting and a refund met with no response, the daughter filed a complaint with the disciplinary board.

(23) In his response to her complaint, respondent stated that the estate was extremely complicated and that the money given to him was not for estate expenses but "to use for costs and bill against for fees." He claimed to have put a great deal of effort into the case and requested additional time to decide the best manner to determine what fee he should charge.

(24) Disciplinary counsel advised respondent that his former clients had requested and deserved an accounting of the $46,444.63 given to him in April. It was pointed out to him that his bank records showed the deposit on April 3, 1996, but indicated that the balance in the account had dropped to $136.86 as of May 8, 1996. He was asked to explain where the money had gone. In his response, respondent again described the complicated nature of the estate and offered to refund $40,000 to the estate.

(25) On March 10, 1997, in connection with an audit of his trust account concerning the obvious problems with the Spriggs and Kelly settlements, respondent produced copies of bills totalling $30,500, which he represented he had sent to Schaap's son for his services to the estate between April 3, 1996, and September 5, 1996. These bills, which failed to set forth specific services performed or time spent on each task, had never been received by Schaap's son and were not in the file sent to the other attorney. Schaap was unaware of their existence until they were shown to him by disciplinary counsel.

(26) Respondent's trust account ledger for the Schaap Estate showed withdrawals from

the estate fund to pay the bills produced by him. These withdrawals, however, are through September 5, 1996, long after the estate's funds in trust with him had been depleted by May 1996. The ledger also indicated a remaining balance in the estate account of $16,394.63 as of September. Bank records pertaining to the trust account did not coincide with this figure.

■ (27) On July 29, 1996, and August 31, 1996, Maria Sanchez sent respondent checks in the amount of $500 each, payable to the "Ids Schaap Estate" for "Farm Rent." The checks were never deposited into the trust account. Respondent simply negotiated them and converted the money to his own use. In this instance, respondent committed further violations of Rules 16–105(A), 16–115(A), 16–115(B), 16–804(C), and 16–804(H) of the Rules of Professional Conduct. Additionally, he violated Rule 16–116(D) by failing upon discharge to surrender property to a client that the client was entitled to receive. Finally, respondent did not contest the allegation that he committed a criminal act that reflected adversely on his honesty, trustworthiness, and fitness as a lawyer in violation of Rule 16–804(B) of the Rules of Professional Conduct.

■ (28) We are both saddened and frustrated by the fact that yet another attorney has seen fit to betray the trust reposed in him by this Court in granting him a license to practice law in this state. We have stated repeatedly that conversion of client funds by an attorney will not be tolerated by this Court and will result in disbarment. *See, e.g., In re Rohr,* 1997 NMSC 012, 122 N.M. 774, 931 P.2d 1390 (1997); *In re Greenfield,* 1996 NMSC 015, 121 N.M. 633, 916 P.2d 833 (1996); *In re Kelly,* 1995 NMSC 039, 119 N.M. 807, 896 P.2d 487 (1995); *In re Evans,* 1995 NMSC 015, 119 N.M. 305, 889 P.2d 1227 (1995); *In re Lopez,* 1994 NMSC 002, 116 N.M. 699, 866 P.2d 1166 (1994); *In re Deutsch,* 1992 NMSC 033, 113 N.M. 711, 832 P.2d 402 (1992); *In re Benavidez,* 111 N.M. 642, 808 P.2d 612 (1991); *In re C'de Baca,* 109 N.M. 151, 782 P.2d 1348 (1989); *In re Hill,* 105 N.M. 641, 735 P.2d 1147 (1987); *In re Gallegos,* 104 N.M. 496, 723 P.2d 967 (1986); *In re Duffy,* 102 N.M. 524, 697 P.2d 943 (1985). We reiterate our position in this opinion.

(29) By consenting to disbarment, respondent avoided a formal hearing on the charges against him. Consequently, we have no transcript of proceedings before us that might help to explain respondent's egregious conduct. Based upon the admitted facts, his trust account records and the records of the account maintained by the bank were irreconcilable. It has been our experience that attorneys will occasionally attempt to utilize their own failure to keep accurate records of trust account transactions as an excuse for their mishandling and/or misappropriation of client funds. It should be noted, therefore, that an attorney's failure to properly maintain accurate records of the receipt and distribution of client funds will be viewed by this Court as an aggravating rather than a mitigating factor in these matters. A prudent attorney may seek guidance or instruction regarding appropriate accounting methods from an accountant or other financial advisor prior to embarking upon a legal career which involves the handling of client monies. Ignorance of or laxity in the proper accounting for such funds will greatly imperil the attorney's future in the law.

■ (30) Now, therefore, it is ordered that the conditional agreement and consent to discipline is hereby approved and that Duane S. Hamar is disbarred from the practice of law pursuant to Rule 17–206(A)(1) NMRA 1997 effective July 30, 1997.

(31) It is further ordered that respondent may not apply for permission to petition this Court for reinstatement for a minimum of three (3) years from July 30, 1997, and must show that he has satisfied the following conditions:

(1) Respondent shall reimburse the following persons in the following amounts, with interest of eight and three-quarters per cent (8¾%) per annum beginning as of July 30, 1997 (or, if said persons have obtained reimbursement from the Client Protection Fund, that he has reimbursed the Fund with interest):

(a) Margaret Spriggs $ 1,685.43
(b) Janet and Amber Kelly 19.80
(c) Mary Goedhart for the
    Estate of Ids Schaap 47,944.63

(2) Respondent shall obtain prospective employment where he will be under the constant supervision of an attorney approved by disciplinary counsel or, if this is not feasible, retain at his own expense the services of a law office management consultant to organize his solo practice;

(3) Respondent shall reimburse the disciplinary board its costs for the investigation and prosecution of these complaints in the amount of $1,274.50 on or before August 30, 1997. Any amount not paid by that date shall thereafter bear interest at the rate of fifteen per cent (15%) per annum; and

(4) Respondent shall take and receive a passing grade on the Multistate Professional Responsibility Examination.

(32) It is further ordered that the disposition of this matter shall have the full force and effect of a judgment.

(33) IT IS SO ORDERED.

(34) /s/ Gene E. Franchini
(35)     Gene E. Franchini, Chief Justice

(36) /s/ Joseph F. Baca
(37)     Joseph F. Baca, Justice

(38) /s/ Pamela B. Minzner
(39)     Pamela B. Minzner, Justice

(40) /s/ Patricio M. Serna
(41)     Patricio M. Serna, Justice

(42) /s/ Daniel A. McKinnon, III
(43)     Daniel A. McKinnon, III, Justice